STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CHRISTINA LIU (CABN 308362)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5051
    FAX: (408) 535-5081
    christina.liu@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 20-373 EJD |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Court: The Honorable Edward J. Davila<br>Date: November 7, 2022<br>Time: 1:30 p.m. |
| MATTHEW SANCHEZ, | |
| Defendant. | |

    The United States submits this sentencing memorandum for the Court's consideration and recommends a sentence of 87 months of imprisonment for defendant Matthew Sanchez, pursuant to the Rule 11(c)(1)(C) plea agreement entered on June 6, 2022. The United States also requests an order of restitution for any qualifying costs that the victim's family may submit between now and Sanchez's sentencing hearing.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Charged Conduct

Matthew Sanchez was a street-level drug dealer who knowingly sold, and conspired to sell, counterfeit M30 pills containing overdose-quantities of fentanyl to Victim 1 in 2018 and 2019 in the Northern District of California. His role in the conspiracy began with buying and selling bottles of alprazolam from Co-Conspirator 1 and expanded in late 2018 to include buying fentanyl-laced M30 pills from Co-Conspirator 1 and selling them onwards to Victim 1 and other individuals.

The M30 pills were shaped and colored to resemble oxycodone pills sold in the legitimate marketplace, and were imprinted with an "M" on one side and a "30" on the other side. Sanchez bought his M30 pills from Co-Conspirator 1, who in turn bought his/her pills from Sanchez's codefendant, Francisco Schraidt Rodriguez.[1] Schraidt Rodriguez supplied the M30 pills to the conspiracy while working at a pharmacy in Mexico.

As part of Sanchez's participation in the conspiracy, he bought and sold alprazolam and counterfeit M30 pills from Co-Conspirator several times over a period of many months. At the peak of his trafficking activities, Sanchez bought 30 bottles of alprazolam and 50 fentanyl-laced M30 pills every two weeks from Co-Conspirator 1. Sanchez paid Co-Conspirator 1 with cash and through Venmo transactions, one of which he disguised as a "rent" payment in attempts to avoid law enforcement detection.

Sanchez knew the M30 pills came from Mexico and knew they contained fentanyl. When he offered to sell these M30 pills to Victim 1 for $20 each, he told Victim 1 that the M30s were mixed with fentanyl and that they were strong. Sanchez went through with these M30 sales to Victim 1 and others

---

[1] Paragraphs 13-15 of the October 24, 2022 version of the PSR describe the roles that Sanchez and codefendant Schraidt Rodriguez played in the charged drug offenses. The United States respectfully requests that these paragraphs be amended to reflect that Schraidt Rodriguez shipped and sold drugs to Co-Conspirator 1, who in turn sold the drugs to Sanchez. Sanchez did not directly interact with Schraidt Rodriguez. Instead, Sanchez bought drugs from Co-Conspirator 1, paid Co-Conspirator 1 for the drugs, and learned from Co-Conspirator 1 that the M30 pills contained fentanyl.

UNITED STATES' SENT'G MEM.
CR 20-373 EJD                             2

despite knowing that they were potent enough to cause overdoses, as Sanchez knew from his own experience, and despite knowing that Victim 1 could very well overdose on the M30s him/her-self.

On August 31 and September 3, 2019, Sanchez sold M30 pills to Victim 1, who ingested them and suffered a fatal fentanyl overdose on September 5, 2019. Victim 1's spouse found Victim 1's unconscious body in their home in the middle of the night and made a heart-wrenching call to 911. Law enforcement agents and first responders arrived quickly at the scene and transported Victim 1 to the hospital, where Victim 1 remained unresponsive and was declared deceased. Victim 1 is survived by his/her spouse and their young son. At the time of this filing, Victim 1's family has not submitted a victim impact statement or a request for restitution.

Sanchez learned of Victim 1's overdose on September 7, 2019, when he reached out to Victim 1 by text message and ended up talking with Victim 1's spouse about the overdose. Sanchez admitted to selling M30 pills to Victim 1, admitted to knowing how dangerous these pills could be, and thanked Victim 1's spouse for the update on Victim 1's overdose.

Nevertheless, Sanchez continued to buy and sell counterfeit M30s afterwards, even with the knowledge that his drug distribution had already caused one overdose death. As described in Paragraphs 22-25 of the October 24, 2022 version of the PSR, within a few weeks of learning about Victim 1's death, Sanchez messaged two potential suppliers about buying M30s from them and then offered to sell M30s and other drugs to a potential drug customer. After Sanchez learned on October 20, 2019 that Co-Conspirator 1 was no longer distributing drugs, Sanchez messaged a third potential supplier within two days and asked if s/he had any M30s for sale.

Sanchez eventually did get his hands on a new batch of M30s from a new supplier with the help of an intermediary. The intermediary tried one of the M30s from this batch and, on October 22, 2019, reported back to Sanchez on his/her experience with the M30s. The intermediary advised Sanchez to warn his customers about the strength of the pills. Sanchez told the intermediary that he was trying to replace his supply of M30s as though nothing had happened, and said he wanted to return this batch of M30s to the supplier because the pills were too strong and Sanchez could not live with an overdose on his hands.

However, instead of stopping his M30 trafficking activities at this point, Sanchez persisted in his attempts to sell and distribute M30 pills. On October 24, 2019, Sanchez offered to sell M30s to yet another person and explained that, because he had lost his Mexican source for M30s and switched to a new supplier, he was now selling M30 pills at $10 more per pill.

<u>State Arrest, Charges, and Conviction</u>

One day later, on October 25, 2019, Sanchez finally ceased his drug distribution activities, due to his arrest by state law enforcement on state drug charges. He was thereafter charged by amended state complaint for various drug offenses. On January 21, 2020, Sanchez pled guilty to a felony drug count and admitted to an enhancement for great bodily injury. On March 3, 2020, Sanchez was sentenced by the state court on Count 2 to 365 days in custody and 4 years of supervised release. Undersigned counsel understands that this 2020 state conviction was for drug conduct that was, at least in part, related to the charged conduct in the instant federal case.

<u>Federal Indictment, Arrest, and Release</u>

On October 6, 2020, a federal grand jury issued an indictment against Sanchez and codefendant Schraidt Rodriguez for conspiring to distribute fentanyl and alprazolam and for distributing fentanyl that resulted in Victim 1's death.

On October 9, 2020, Sanchez was arraigned in magistrate court on the indictment.

On October 15, 2020, the magistrate judge held a detention hearing and ordered Sanchez's release.

<u>Superseding Information, Plea, and Codefendant Sentencing</u>

On May 23, 2022, the United States filed a superseding information charging Sanchez with one count of conspiracy to distribute fentanyl and alprazolam, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C), and one count of fentanyl distribution, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On June 6, 2022, Sanchez pled guilty to the two charged counts pursuant to a proposed Rule 11(c)(1)(C) plea agreement providing for a sentencing term of imprisonment between 60 months and 96 months.

On August 29, 2022, this Court sentenced codefendant Schraidt Rodriguez to 90 months of custody and 3 years of supervised release.

## II.     SENTENCING CALCULATIONS AND RECOMMENDATION

### A.     Criminal History Category

The United States agrees with Probation's calculation of a criminal history category of IV. However, it respectfully disagrees with Probation's analysis of Sanchez's state conviction in Paragraph 52 of the October 24, 2022 version of the PSR, in the following respects:

First, the United States disagrees with the assignment of one point for this conviction and respectfully submits there should be no points assigned because the underlying state conduct was, in fact, part of the instant federal offenses. Undersigned counsel understands that Sanchez received the 2020 state conviction based on underlying drug conduct that overlapped, at least in part, with Sanchez's distribution conduct that led to Victim 1's overdose death on September 5, 2019,[2] *i.e.*, drug conduct with which Sanchez has been charged and to which he has pled in the instant federal case. As such, Sanchez's 2020 state sentence is not a qualifying "prior sentence" under USSG § 4A1.2(a)(1) and this state conviction should be assigned no points. However, this proposed correction does not affect the overall calculation of the criminal history score or the criminal history category, because, as Paragraph 53 of the PSR indicates, a maximum of four points has already been counted under USSG § 4A1.1(c).

Second, as a factual clarification, the United States respectfully submits that the nature of this 2020 state conviction should reference the enhancement for great bodily injury in addition to describing the underlying drug offense. Moreover, the United States respectfully requests that the sentence imposed should reflect a sentence of 365 days in jail in addition to the noted 4 years of probation, and that the imposition date of the sentence should reflect a date of March 3, 2020.

---

[2] Paragraph 52 of the October 24, 2022 version of the PSR describes the underlying state conduct as involving an overdose death on October 22, 2019. The United States respectfully submits that this date should be corrected to September 5, 2019, the date of Victim 1's overdose death in the instant federal case.

### B. Sentencing Guidelines Calculation

Under the particular facts of this case and as described more fully below, the United States does not dispute Probation's calculation of the base offense level as 20 based on the attributable drug weight, pursuant to USSG. § 2D1.1(c)(10), nor does it dispute Probation's calculation of a total base offense level of 17 and a resulting Sentencing Guidelines Range of 37-46 months.

However, the United States reserves the right, in future overdose cases with plea agreement admissions to the resulting death, to argue that USSG § 2D1.1(a)(2) applies and that the base offense level should be 38, rather than based on the attributable drug weight.

Here, Sanchez was charged by superseding information with drug offenses that did not allege the death-resulting enhancement. He pled guilty to those offense pursuant to a plea agreement and admitted in Paragraph 2 that his drug conduct caused Victim 1's overdose death. Paragraph 7(a) of the plea agreement is silent on the applicable base offense level and leaves the matter open for the Court to determine, though the citation to § 2D1.1(c)(10) does imply that, in this case, the attributable drug weight is relevant to the inquiry into Sanchez's base offense.

The plain text of § 2D1.1(a)(2) provides for a base offense level of 38 "if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C) . . ." and "the offense of conviction"—as opposed to "offense" or "relevant conduct"—establishes that death or serious bodily injury resulted from the use of the substance." Although the Sentencing Guidelines do not expressly define "offense of conviction" in the context of § 2B1.1(a)(2), other provisions, such as USSG §§ 1B1.2(a) and 1B1.11 n.2, appear to define the "offense of conviction" as the "offense conduct charged in the count of the indictment or information of which the defendant was convicted." As a result, § 2D1.1(a)(2) appears to apply only if defendant is convicted of an enumerated drug offense and the charged offense establishes a resulting death or serious bodily injury. Here, Sanchez has charged with and has pled to two drug offenses, one of which is a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), but neither of the drug offenses charge the death-resulting enhancement.

USSG § 1B1.2(a) instructs that if a plea agreement contains a stipulation specifically establishing a more serious offense than the offense of conviction, then it is the offense guideline for the stipulated-

to, more serious offense that applies. Application note 1 clarifies that in this circumstance, the plea agreement must contain the parties' explicit agreement that such a stipulation is a stipulation for this purpose. Here, Sanchez's plea agreement does not contain an explicit agreement that his admission to the resulting death was a stipulation for purposes of § 1B1.2(a) or the for the purposes of determining the base offense level. Indeed, as discussed, Paragraph 7(a) of his plea agreement references his base offense level and includes a citation to § 2D1.1(c)(10), a provision that otherwise sets the base offense level at 20 based on the attributable drug weight.

Undersigned counsel is aware of only one Ninth Circuit decision to have addressed the application of § 2D1.1(a)(2) in similar circumstances, though not squarely on this particular issue. In an unpublished decision in *United States v. Deeks*, 303 F. App'x 507 (9th Cir. 2008), the Ninth Circuit held:

> Finally, the district court properly applied Sentencing Guideline § 2D1.1(a)(2), which requires a base offense level of 38 if the defendant is convicted of importation of a controlled substance and "the offense of conviction establishes that death or serious bodily injury resulted from use of the substance." The Guideline applies if the government proved that the controlled substance Deeks imported into the United States was used by Danelle Garza and caused her death; the government is not required to prove foreseeability. *See United States v. Houston,* 406 F.3d 1121, 1122–24 (9th Cir.2005) (interpreting 21 U.S.C. § 841(b)(1)(C) which contains language nearly identical to U.S.S.G. § 2D1.1(a)(2)). The district court's finding that the cocaine imported by Deeks caused Garza's death was not clearly erroneous.

*Id.* at 509-10. In other words, the Ninth Circuit appears to have endorsed the application of § 2D1.1(a)(2) where the charged offense did not allege a death but the government proved it by an unidentified standard.

Other Circuits appear to be split on this issue of whether § 2D1.1(a)(2) applies upon a factual finding of the resulting death, where the charged offense does not allege the resulting death. *See United States v. Greenough*, 669 F.3d 567 (5th Cir. 2012) (holding, in a case with insufficient evidence that defendant's drugs caused the death, that § 2D1.1(a)(2) applies only when death is part of crime of conviction); *United States v. Rebmann*, 321 F.3d 540, 543-45 (6th Cir. 2003) (holding that § 2D1.1(a)(2) applies only if death is an element of offense of conviction *and* there is a finding, beyond a reasonable doubt, of the resulting death); *United States v. Lawler*, 818 F.3d 281, 283-85 (7th Cir. 2016) (holding

that § 2D1.1(a)(2) applies only if the resulting death is a charged element *or* proven beyond a reasonable doubt); *United States v. Shah*, 453 F.3d 520, 524 (D.C. Cir. 2006) (affirming application of § 2D1.1(a)(2) where charged drug offense apparently did not allege the resulting death, but defendant admitted that his drugs resulted in death and parties "understood that defendant was accountable for the death as part of his offense"); *see also United States v. Pressler*, 256 F.3d 144, 157 n.7 (3rd Cir. 2001) (inviting the Sentencing Commission to comment on this issue).

Thus, although the United States does not argue that § 2D1.1(a)(2) applies to the particular circumstances of this case, it reserves its right to do so in future overdose cases in different postures, where defendants are charged with and plead guilty to drug offenses that do not allege the resulting death but who nevertheless admit that their drugs resulted in death or serious bodily injury, pursuant to plea agreements with different terms than the ones in Sanchez's plea agreement.

### C. Sentencing Recommendation

The United States now recommends a sentence of 87 months of imprisonment, which is appropriate based on the sentencing factors set forth in 18 U.S.C. § 3553(a). A significant custodial term is appropriate based on Sanchez's history and characteristics, the nature and circumstances of his offenses, the need for deterrence and public protection, and the need to avoid unwarranted sentence disparities. §§ 3553(a)(1), (2), (6).

Sanchez was a street-level dealer who knowingly sold M30s containing overdose-quantities of fentanyl to Victim 1, even though he knew the dangers of doing so. He knew the M30 pills were counterfeit, illegitimate, sourced from Mexico, and contained fentanyl. He knew they contained fentanyl because Co-Conspirator 1 told him so when Co-Conspirator 1 sold the pills to him, and he knew that the amount of fentanyl in each pill was enough to cause an overdose, based on his experience in sampling his own M30 pills. He had many opportunities to stop selling his deadly M30s to drug customers, but he persisted in sourcing and continuing to distribute M30s even after he learned that his actions caused Victim 1's overdose death, all the way up until his October 25, 2019 state arrest on factually overlapping conduct. His repeated decisions to source and sell M30s include:

First, as described, Sanchez sold M30s to Victim 1 on at least two occasions, knowing that

Victim 1 was a vulnerable individual who could overdose on the M30s. In August 2019 and September 3, 2019, Sanchez sold M30 pills to Victim 1, who ingested the pills and did in fact suffer an overdose. Victim 1 fell into an unresponsive state and died on September 5, 2019 as a result of the fentanyl in Sanchez's M30 pills. Victim 1's spouse is the one who found Victim 1's unconscious body in their home, the one who called for help, and the one who informed Sanchez on September 7, 2019 of Victim 1's overdose death. Sanchez told Victim 1's spouse that he knew that M30 pills were dangerous and thanked Victim 1's spouse for informing him of Victim 1's death.

Second, and yet, Sanchez continued to traffic in M30s, as described above. After finding out on September 7, 2019 that his drug distribution caused Victim 1's overdose death, Sanchez initiated and continued conversations with two potential suppliers in attempts to get more M30s from other sources, and messaged a potential drug customer with offers to sell M30s. Then, after learning on October 20, 2019 that Co-Conspirator 1 would no longer sell him M30s, Sanchez reached out to a third potential supplier to see if s/he had any M30s for sale. Sanchez eventually did succeed in buying a new batch of M30s. After getting feedback from the intermediary on October 22, 2019 about the strength of these new M30s, Sanchez claimed that he would stop selling these M30s because he could not live with an overdose on his hands. Nevertheless, on October 24, 2019, Sanchez tried selling M30s to another potential drug customer, this time at a higher price.

In other words, Sanchez's initial decision to continue selling M30s to Victim 1, and his repeated, subsequent decisions to source more M30s and to sell more M30s to individuals, with full knowledge that his M30s had already killed one person, were inexplicable and unspeakably horrible. His persistent drug distribution activities had disastrous effects on his drug customers, their families, and their communities.

As the United States described in its sentencing arguments for codefendant Schraidt Rodriguez, fentanyl is a synthetic opioid 30 times more potent than heroin and its abuse has become alarmingly more prevalent and exponentially more dangerous in recent years.[3] From May 2019 to May 2020, for

---

[3] United States Sentencing Commission, Fentanyl and Fentanyl Analogues: Federal Trends and Trafficking Patterns 2 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-

example, the United States recorded 81,230 drug overdose deaths, which was "the largest number of drug overdoses ever recorded" in a twelve month period.[4]  As reported by the CDC, "[s]ynthetic opioids are the primary driver of the increases in overdose deaths" and "the increase in synthetic opioid-involved overdoses is primarily linked to illicitly manufactured fentanyl."[5]

These statistics are horrifying and it can be easy to forget that each of these heartbreaking numbers represents a real victim, with real families, who feel real pain.  This case is atypical in that the United States did identify one overdose victim who died as a result of Sanchez's M30s:  Victim 1, who ingested Sanchez's M30 pills and suffered a fatal overdose as a result.  Victim 1's spouse found Victim 1's unresponsive body and promptly called 911 – but it was too late to save Victim 1.  The lives of Victim 1's family, and everyone in the community who knew and loved Victim 1, have been forever changed by this unspeakable loss of life.  So too, have the lives of any other Sanchez's drug customers who may have overdosed on Sanchez's M30s, but whose overdoses or overdose deaths have unfortunately escaped law enforcement investigation.

The full scope of the consequences wreaked by Sanchez's various batches of M30 pills may never be known.  The severity and dangerousness of his conduct cannot be overstated, and neither can the need for public protection and deterrence.  *Se* § 3553(a)(2)(A), (B), (C).

California law provides helpful guidance in determining an appropriate sentence in this case.  The Penal Code provides a 4, 6, and 10-year sentencing triad for gross vehicular manslaughter with intoxication.  Cal. Penal Code § 191.5(c)(1).  The triad for voluntary manslaughter is 3, 6 or 11 years.  *Id.* § 193(a).  Both crimes require *mens rea* similar to that of Sanchez's here.  Gross vehicular manslaughter requires a showing of gross negligence, which means the defendant acted in a reckless way that created a high risk of death or great bodily injury, and that the defendant knew her/his acts created that risk.  Cal. Crim. Jury Instr. 590.  Voluntary manslaughter can be charged where the

---

publications/research-publications/2021/20210125_Fentanyl-Report.pdf.

[4] Centers for Disease Control and Prevention, HAN00438 (published Dec. 17, 2020) (last accessed Oct. 31, 2022), https://emergency.cdc.gov/han/2020/han00438.asp.

[5] *Id.*

defendant acted with conscious disregard for life and the defendant's act caused someone's death. *People v. Bryant*, 56 Cal. 4th 959, 968 (2013) ("A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter."); Cal. Crim. Jury Inst. 572.

Here, Sanchez acted with something akin to gross negligence or conscious disregard when he knowingly distributed fentanyl to Victim 1, which led to Victim 1's overdose death. Sanchez knew the fentanyl in his M30s were dangerous, powerful, and could cause overdoses. Although Sanchez likely did not want or intend for Victim 1 to die, he must or should have known that an overdose death was a very real possibility—and yet Sanchez provided Victim 1 with the M30s anyway. His actions reflect at least gross negligence of the risk of Victim 1's death and the risk of Sanchez's other drug customers' deaths. A significant custodial sentence of 87 months is warranted to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to specifically deter Sanchez from selling M30s or other drugs again, and to generally deter other similarly situated defendants who may distribute M30s or fentanyl in other cases. *See* § 3553(a)(1), (2)(A), (2)(B), (2)(C).

Furthermore, the need to avoid unwarranted sentencing disparities among similarly situated defendants also counsels toward a substantial custodial sentence. Undersigned counsel is aware of eight other recent defendants in this district whose drug overdose cases have publicly gone to sentencing and judgment:

- In 2017, Rodolfo Rivera-Herrera, a full-time drug dealer who was in CHC II and who sold 8,000 grams of heroin in a large-scale heroin conspiracy, including one gram of heroin that was ultimately sold to a victim who overdosed and died, was sentenced to 145 months in prison. *See United States v. Rivera-Herrera*, CR 15-579 VC, Dkt. 629 (Judgment).
- In 2021, Shane Cratty and Lindsay Bain Muniz were sentenced for their roles in arranging a fentanyl sale to an overdose victim who used their fentanyl in the presence of his child, both of whom suffered overdose deaths. Cratty, who was in CHC VI and who delivered the fentanyl to the victim-buyer and observed this victim with a child in tow, was sentenced to 96 months in

prison. *See United States v. Cratty*, CR 19-681 CRB, Dkt. 122 (Judgment). Muniz, who was in CHC V and who supplied the fentanyl to Cratty, was sentenced to 90 months in prison. *See United States v. Muniz*, CR 19-681 CRB, Dkt. 127 (Judgment).

- In April 2022, Xavier Jimenez Robledo, a defendant in CHC IV who distributed fentanyl-laced M30 pills that resulted in two victims' overdoses, one fatally so, was sentenced to two concurrent custodial terms of 96 months. *See United States v. Robledo*, CR 21-114 BLF, Dkt. 83 (Judgment).

- In June 2022, Susan Arreola-Martin, a defendant in CHC III who fatally provided fentanyl to her granddaughter while Arreola-Martin was on pretrial release, was sentenced to 60 months in prison for her fentanyl distribution conduct, a sentence which ran concurrently and consecutively to three custodial sentences that were imposed at the same time in a mortgage fraud case. *See United States v. Arreola-Martin*, CR 21-445 JD, Dkt. 28 (Judgment).

- In August 2022, Gage Pascoe, a defendant in CHC I who sold fentanyl-laced M30 pills that caused his high school friend's overdose death, was sentenced to 68 months in prison. *See United States v. Pascoe*, CR 22-25 WHA, Dkt. 80 (Judgment).

- Also in August 2022, Sanchez's codefendant Francisco Schraidt Rodriguez, a defendant in CHC I who worked at a Mexican pharmacy and sold M30 pills containing fentanyl to Co-Conspirator 1 (who sold the M30 pills to Sanchez, who sold the pills onwards to Victim 1), was sentenced by this Court to 90 months in prison. *See United States v. Schraidt Rodriguez*, CR 20-373 EJD, Dkt. 99 (Judgment).

- In October 2022, Kameron Reid, a defendant in CHC V who distributed fentanyl to several of her fellow inmates at Santa Rita Jail and watched on as one inmate overdosed and died, was sentenced to 84 months in prison. *See United States v. Reid*, CR 22-142 JST, Dkt. 44 (Minute Entry for Sentencing Hearing).

Like these defendants, Sanchez should be sentenced to a significant custodial term that reflects the severity, gravity, and tragedy of their fatal drug distribution conduct.

All of these considerations weigh heavily in favor of a lengthy custodial sentence for Sanchez.

At the same time, however, Sanchez accepted responsibility in this case for selling fentanyl to Victim 1. He has pled guilty to drug conspiracy and fentanyl distribution offenses and admitted in the the plea agreement that his drug conduct caused Victim 1 to fatally overdose. His timely decision to plead guilty, paired with this Court's sentencing decision, will provide Victim 1, his/her family, and his/her community with closure and a greater ability to grieve their profound losses on their own terms, without having to re-live their painful memories at a trial in open court. Moreover, Sanchez's criminal history record consists solely of misdemeanor convictions for which he was sentenced to 180 or fewer days in jail, along with his state conviction for partially overlapping drug conduct, for which he was sentenced to 365 days in jail. The United States' recommended sentence of 87 months will far exceed the longest sentence that Sanchez has thus far served, such that a sentence longer than 87 months would be greater than necessary to achieve the purposes of sentencing in this particular case.

As a result, the United States respectfully requests a custodial sentence of 87 months, which is appropriate and just under these circumstances and the § 3553(a) factors.

### D.    Restitution

At the time of this filing, undersigned counsel has not received a victim impact statement or a restitution request. If the victim's family does submit a victim impact statement or a restitution request, undersigned counsel will promptly notify the Court and defense counsel.

## III.    CONCLUSION

The United States respectfully recommends a sentence of 87 months of imprisonment, pursuant to the Rule 11(c)(1)(C) plea agreement, and a restitution order for any qualifying expenses that the victim's family may submit before or at defendant Matthew Sanchez's sentencing hearing.

DATED: October 31, 2022                             Respectfully submitted,

                                                    STEPHANIE M. HINDS
                                                    United States Attorney

                                                    /s/ *Christina Liu*
                                                    CHRISTINA LIU
                                                    Assistant United States Attorney